JAMES E. ANDERSON AND ALICE ANDERSON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1533–70. Filed September 27, 1971.

*David J. Creagan, Jr.,* and *John H. Overbeck, Jr.,* for the petitioners.

*James F. Hanley, Jr.,* for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency of $21,897.64 in the petitioners' income tax for the taxable year ending December 31, 1966. The only issue for our consideration is whether payments made by petitioner James E. Anderson to his employer, pursuant to an alleged violation of section 16(b) of the Securities Exchange Act of 1934, constitute an ordinary and necessary expense of petitioner James E. Anderson's business.

### FINDINGS OF FACT

A stipulation of facts filed by the parties is incorporated herein as part of our findings of fact.

Petitioners James E. Anderson and Alice Anderson, husband and wife, filed their 1966 joint Federal income tax return with the district

director of internal revenue at Chicago, Ill. They resided in Elmwood Park, Ill., at the time the petition herein was filed. Alice Anderson is a petitioner herein only by virtue of having joined in filing the aforesaid joint return. All references herein to petitioners shall be deemed to refer to James E. Anderson.

In 1942, petitioner joined Zenith Radio Corp. (hereinafter referred to as Zenith) as a purchasing agent. He became vice president, director of purchasing, in 1947 and continued in that capacity until his retirement on September 1, 1968. He was responsible for the procurement of the raw materials, machinery, and labor necessary for the manufacture of Zenith's products, including radios, television sets, and hearing aids. In 1966, purchases made by petitioner on behalf of Zenith totaled approximately $350 million.

On January 30, 1956, petitioner entered into an employment agreement which covered the period from January 1, 1955, through December 31, 1964. This agreement was extended by mutual consent through December 31, 1965. It provided, in part, that, upon its expiration, Zenith agreed to employ petitioner in an advisory capacity for a length of time equal to his full-time employment since January 1, 1955, at an annual salary of $20,000, in return for which petitioner agreed to perform services for Zenith for no more than 60 days per year. As of December 31, 1965, petitioner had accrued 11 years of full-time employment.

On May 11, 1966, petitioner and Zenith executed a second employment contract, confirming their agreement that petitioner would be employed on a full-time basis effective January 1, 1966, through December 31, 1968. Under this agreement, petitioner received an annual salary of $50,000 plus a bonus based upon Zenith's annual net income. Zenith retained the right to terminate petitioner's employment at any time, in which case petitioner would commence serving Zenith in the aforementioned advisory capacity. In 1966, petitioner reported income of $173,332.14 as a result of his employment with Zenith.

In 1962 and 1963, petitioner, pursuant to an employee stock purchase agreement dated November 25, 1958, purchased a total of 1,000 shares of Zenith common stock for $14,038.90. In April of 1966, petitioner sold these shares on the open market for $162,923.21 and reported a long-term capital gain of $148,884.31. On April 11, 1966, following the sale of the aforementioned shares and pursuant to a second employee stock purchase agreement, dated August 5, 1964, petitioner purchased 750 shares of Zenith common stock for $49,312.50.

On May 2, 1966, petitioner filed a "Statement of Changes of Beneficial Ownership of Securities" with the Securities and Exchange Commission (SEC), reporting the details of the aforementioned sale and purchase of Zenith stock. Prior to May 11, 1966, petitioner was advised

by Zenith that the aforementioned sale and subsequent purchase of Zenith stock violated section 16(b) of the Securities Exchange Act of 1934.[1] Petitioner responded that he did not think this was the case and, upon receiving a demand for payment from Zenith's legal department, referred the matter to his attorneys. They informed him that Zenith had no alternative but to demand payment from him.

Although he believed (and still believes) that he had done nothing wrong, petitioner reasonably assumed that if he failed to comply with Zenith's demand, his position would be in jeopardy and his business reputation would be damaged. On May 19, 1966, petitioner's attorneys, acting on his behalf, informed Zenith of petitioner's intent to comply with its demand. Accordingly, petitioner paid Zenith $51,259.14, exclusive of interest, in connection with the alleged section 16(b) violation and deducted this sum as an ordinary and necessary business expense.

Petitioner remained a full-time employee of Zenith until September 1, 1968, at which time he refused an offer of 3 additional years of full-time employment and voluntarily retired. Zenith had no mandatory retirement age for its employees and it was not until July of 1968 that petitioner decided to retire.

In his notice of deficiency, respondent determined that the payments made to Zenith should be treated as long-term capital losses and recalculated the petitioners' tax for 1966 accordingly.

ULTIMATE FINDING OF FACT

Petitioner's payment of $51,259.14 to Zenith was made to preserve his employment with Zenith and avoid injury to his business reputation.

OPINION

In April of 1966, petitioner sold 1,000 shares of Zenith stock, from which he realized a long-term capital gain of $148,884.31. Several

---

[1] Sec. 16(b) provides as follows:

For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) within any period of less than six months, unless such security was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security purchased or of not repurchasing the security sold for a period exceeding six months. Suit to recover such profit may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized. This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase of the security involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection. [15 U.S.C. sec. 78p.]

days later, in apparent violation of section 16(b) of the Securities Exchange Act of 1934, petitioner purchased 750 shares of Zenith stock for $49,312.50. In response to Zenith's demand for payment under section 16(b), petitioner paid Zenith $51,259.14 during 1966.

The sole issue herein relates to the deductibility of such amount. Petitioner urges us to adhere to our decision in *William L. Mitchell*, 52 T.C. 170 (1969), rev. 428 F. 2d 259 (C.A. 6, 1970), and to hold that he is entitled to a deduction as an ordinary and necessary business expense under section 162(a).[2] Respondent counters with a two-pronged argument for the proposition that petitioner is entitled only to treat the payment as a long-term capital loss: (1) Petitioner has not satisfied the requirement of section 162(a), in that he has failed to establish that his belief that his status and reputation as a corporate executive would be jeopardized by nonpayment was reasonable, and (2) we should, in any event, follow the reversal of our decision in *Mitchell* and hold that the tax treatment of the payment in question should be controlled by the capital gain coloration of the profit from the sale of the Zenith shares. For the reasons hereafter stated, we hold for petitioner.

We deal first with the question whether, aside from the impact of the *Mitchell* reversal, petitioner has satisfied the requirements of section 162(a). It is clear that, if a violation of section 16(b) of the Securities Exchange Act of 1934 occurred, it was unintentional on petitioner's part. Respondent does not challenge petitioner's assertion that he was in the trade or business of being a corporate executive. Nor does he seriously contest the fact that petitioner personally believed that his position as a corporate executive of Zenith would be in jeopardy if he did not make the payment. Rather, his argument is directed to the reasonableness of petitioner's belief and is based primarily on the fact that the second employment contract between petitioner and Zenith was executed at a time subsequent to Zenith's demand but before petitioner had agreed to make the payment in satisfaction thereof. We think that respondent takes too narrow a view of the circumstances in which petitioner found himself. Our Findings of Fact set forth in detail those circumstances and we see no need to repeat them here. We note, however, two significant facts, without in any way indicating, that, in their absence, we would have sustained respondent's contention. First, it is apparent that, although the second employment agreement was not formally signed until May 11, 1966, it clearly represented confirmation of a prior agreement between petitioner and Zenith for a continuation of his employment from January 1, 1966. Second, Zenith had the right to terminate that

---

[2] All references, unless the context indicates otherwise, are to the Internal Revenue Code of 1954, as amended.

agreement at will, in which event petitioner would have suffered a substantial decrease in income. Upon the basis of the entire record herein, we have found that petitioner's belief was reasonable and consequently hold that he has satisfied the usual test of deductibility under section 162(a).[3] *William L. Mitchell, supra; Laurence M. Marks*, 27 T.C. 464 (1956).

We now turn to the critical issue herein. Under substantially identical circumstances, we held in *William L. Mitchell, supra*, that a payment by a corporate executive in discharge of his apparent obligation to his employer under section 16(b) of the Securities Exchange Act of 1934 was a deductible expense under section 162(a). In so holding, we refused to apply the principle of *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952), and thereby limit the taxpayer to a deduction for a capital loss. The Sixth Circuit reversed us on the grounds that (1) the character of the payment was controlled by the underlying sale-purchase which gave rise to the apparent violation of section 16(b) and (2) the right of deduction under section 162(a) was subordinate to the principles of *Arrowsmith* and its progeny. In so holding the Court of Appeals relied heavily on *United States* v. *Skelly Oil Co.*, 394 U.S. 678 (1969), and suggested that, if we had considered *Skelly Oil*, we would have decided *Mitchell* the other way. See 428 F. 2d at 262. With all due deference to the Sixth Circuit Court of Appeals, we decline to adopt its conclusion.

We see no need to restate our reasons for holding that *Arrowsmith* does not apply herein. They are fully set forth in our opinion in *Mitchell*. It is sufficient to emphasize that in *Arrowsmith* the payment which the taxpayer was called upon to make arose out of his status as a shareholder of the corporation; he was required to meet an obligation which attached to the assets which he had received in the course of a corporate liquidation. The same analysis disposes of *Skelly Oil*. In that case, the taxpayer was a supplier, which received sums from its customers in an earlier year against which it took a depletion deduction. When it refunded that money in a later year, it was carrying out obligations imposed upon it as that same supplier with respect to those same funds.

In the instant case, the situation is quite different. Here, the sale was made by petitioner in his capacity as a stockholder of Zenith. His obligation to make the payment in question arose out of his status as an employee of Zenith. Neither the sale or purchase nor the combina-

---

[3] Given the realities of the business world, we refuse to enter into what we think would be an Alice in Wonderland discussion as to whether the proper test is whether petitioner's belief was reasonable or was not unreasonable. See *William L. Mitchell*, 52 T.C. 170, 176 (1969) ; cf. *Joseph P. Pike*, 44 T.C. 787, 799 (1965) ; *Old Town Corporation*, 37 T.C. 845 (1962).

tion thereof imposed any obligation upon him. Thus, *Arrowsmith* and *Skelly Oil* are both distinguishable because the payment was not directly and integrally related to the earlier sale transaction which gave rise to the capital gain and because the status of petitioner in making the payment differed from that which he had at the time such gain was realized.

Other cases relied upon by respondent are also distinguishable. *Commissioner* v. *Anders*, 414 F. 2d 1283 (C.A. 10, 1969), reversing 48 T.C. 815 (1967), involved the question of whether payment for an item which had been deducted as an expense in an earlier year, represented the "recovery" of an amount previously deducted or the proceeds of a qualifying sale or exchange under section 337. While there may be some superficial applicability of the rationale of *Anders* to the instant case, in point of fact, that case addressed itself to the interpretation of a particular section of the Code dealing with a limited situation. Under such circumstances, we see no need to reconsider our own position with respect to that issue in order to determine whether that rationale should be extended in other more general areas. In *Tennessee Foundry & Machine Co.* v. *Commissioner*, 399 F. 2d 156 (C.A. 6, 1968), affirming per curiam 48 T.C. 419 (1967), the question was whether the taxpayer, which, *as an employer*, had deducted an embezzlement loss in an earlier year and which, *also in its capacity as former employer*, had been paid, by way of restitution, the proceeds of an insurance policy on the life of the embezzler-employee, which policy had been the subject of a post-death assignment by his widow, was entitled to the benefit of the exclusion contained in section 101(a). It is not without significance that neither this Court nor the Sixth Circuit considered that *Arrowsmith* was involved. In *Estate of McGlothlin* v. *Commissioner*, 370 F. 2d 729 (C.A. 5, 1967), affirming 44 T.C. 611 (1965), the taxpayer was the recipient of shares in a tax-free reorganization and, *in that same capacity* and as part of the reorganization exchange, gave a guaranty that certain assets would produce a stated amount by way of sale; the payment in a later year by way of implementation of that guaranty was held to be a part of the cost of the stock acquired in the reorganization and not a deductible loss in a transaction entered into for profit under section 165(c)(2), on the ground that "the payment was in discharge of an obligation made *as a part* of the tax free reorganization." [4] (Emphasis added.) See 370 F. 2d at 732.

---

[4] Respondent has conceded that petitioner is entitled to a capital loss and has made no contention that the payment in question herein should be treated as part of the cost of the Zenith stock purchased by petitioner. See concurring opinion of Drennen, *J.*, in *William L. Mitchell*, 52 T.C. at 176; Lokken, "Tax Significance of Payments in Satisfaction of Liabilities Arising under Section 16(b) of the Securities Exchange Act of 1934," 4 Ga. L. Rev. 298, 305 *et seq.* (1970).

Respondent seeks to draw sustenance from the statement in *Skelly Oil* that—

The rationale for the *Arrowsmith* rule is easy to see; if money was taxed at a special lower rate when received, the taxpayer would be accorded an unfair tax windfall if repayments were generally deductible from receipts taxable at the higher rate applicable to ordinary income. The Court in *Arrowsmith* was unwilling to infer that Congress intended such a result. [See 394 U.S. at 685.]

We think that respondent has failed to recognize that the Supreme Court was speaking in the narrow context of a situation where the taxpayer, having received money *in one capacity*, was required *in that same capacity* to *repay* that money to the person who made the payment. Thus, the above-quoted language uses the words "repayments" and throughout the Court's opinion the words "restore," "repayment," "refunded," and "refunds" are used. The thrust of the Court's thinking is further revealed by its extended analysis of section 1341, which confers an option with respect to the computation of tax where a taxpayer restores a substantial amount received under a claim of right. The Court clearly recognizes that section 1341 in no way restricts the deduction to which a taxpayer would otherwise be entitled and "that it is necessary to refer to other portions of the Code to discover how much of a deduction is allowable." See 394 U.S. at 683.

As we see it, respondent's position in this case comes down to this: If petitioner had not sold his Zenith stock with respect to which he was entitled to long-term capital gain treatment, he would not have been exposed to a demand for the payment in question. Therefore, the petitioner is limited to a long-term capital loss deduction with respect to that payment. We think that respondent paints with too broad a brush in contending for such a simple "but for" test. It is not enough that the relationship between two transactions is merely that "the fruit of the first was the subject of the second." See *Alvarez* v. *United States*, 431 F. 2d 1261, 1264 (C.A. 5, 1970). There must be a sufficient nexus to require the conclusion that the later transaction was so integrally related to the earlier transaction that the transactions must be considered as parts of a unified whole. Cf. *Guffey* v. *United States*, 339 F. 2d 759 (C.A. 9, 1964); *Wener* v. *Commissioner*, 242 F. 2d 938 (C.A. 9, 1957), affirming 24 T.C. 529 (1955); *Joe M. Smith*, 48 T.C. 872, 880 (1967), modified on other issues 424 F. 2d 219 (C.A. 9, 1970); *Alvin B. Lowe*, 44 T.C. 363 (1965); *Johnson-McReynolds Chevrolet Corporation*, 27 T.C. 300 (1956); *Estate of James M. Shannonhouse*, 21 T.C. 422 (1953). The application of the distinction between separation and integration finds expression in cases dealing with the deductibility of payments under guarantees of corporate indebtedness by corporate shareholders. See *J. Meredith Siple*, 54 T.C. 1 (1970), and cases discused therein.

A further analogy is to be found in cases dealing with loans to a

corporation by its stockholder-employees, wherein it is recognized that if the taxpayer can prove that the making of the loan stemmed from his desire to protect his status as an employee rather than his status as a shareholder, he is entitled to a business bad debt deduction. Compare *Trent* v. *Commissioner*, 291 F. 2d 669 (C.A. 2, 1961), with *Niblock* v. *Commissioner*, 417 F. 2d 1185 (C.A. 7, 1969), affirming a Memorandum Opinion of this Court; *Weddle* v. *Commissioner*, 325 F. 2d 849 (C.A. 2, 1963), affirming 39 T.C. 493 (1962).[5] These cases lend support to our focusing herein on the difference between petitioner's *status* as a seller of stock, with respect to which he realized capital gain, and as an employee, with respect to which he claims the deduction herein. See also *John E. Turco*, 52 T.C. 631, 635 (1969), wherein we indicated that the taxpayers might have prevailed if they had been able to prove that the expenditures, relating to certain property, were made to maintain good relations with a lessee rather than in recognition of their obligations as sellers of the property.

Finally, our analysis herein is consistent with decisions dealing with the treatment of payments received subsequent to a transaction which is considered closed for tax purposes. E.g., *Campagna* v. *United States*, 290 F. 2d 682 (C.A. 2, 1961); *Hale* v. *Helvering*, 85 F. 2d 819 (C.A.D.C. 1936), discussed in *Wener* v. *Commissioner, supra.* Compare *Alvarez* v. *United States, supra.*

Reviewed by the Court.

*Decision will be entered for the petitioners.*

---

DAWSON, *J.*, dissenting: I respectfully dissent. In attempting to reaffirm this Court's position adopted in *William L. Mitchell*, 52 T.C. 170 (1969), revd. 428 F. 2d 259 (C.A. 6, 1970), the majority concludes that the petitioner herein sold his stock in his capacity as a Zenith shareholder while his obligation to restore his gain to Zenith arose out of his status as an employee. This distinction fails to persuade me that petitioner's repayment to Zenith was not directly and integrally related to the sales transaction of Zenith stock which gave rise to his capital gain.

As noted in *Booth* v. *Varian Associates*, 334 F. 2d 1 (C.A. 1, 1964), certiorari denied 379 U.S. 961, section 16(b) of the Securities Exchange Act of 1934 is remedial rather than penal and includes all profits realized by those assumed by the statute to have access to inside information whether or not an intention to profit from the unfair use of such information can be shown. Included in this group of persons are officers, directors, or beneficial owners of more than 10 percent of any class of stock in the company involved. As I view the payment made by

---

[5] See also *Isador Jaffe*, T.C. Memo. 1967–215; *Philip W. Fitzpatrick*, T.C. Memo. 1967–1.

petitioner to Zenith, stripping him of the capital gain he realized on the sale of his Zenith stock, it was in essence the satisfaction of any "obligation" he may have had under section 16(b). Regardless of why he agreed to make, or may have been required to make, this payment, it was inextricably intertwined with petitioner's stock transactions of April 1966. Petitioner's payment was neither a fine nor a settlement of a claim for punitive damages arising out of his conduct. He was merely called upon to restore to Zenith any gain which he realized as a result of his "insider" position. Accordingly, I think that the rationale of *Arrowsmith* v. *Commissioner*, 344 U.S. 6 (1952), and *United States* v. *Skelly Oil Co.*, 394 U.S. 678 (1969), is applicable to this case. No matter how artfully the majority has tried, I doubt whether they have successfully blunted the thrust of these cases.

To bestow upon this petitioner and others similarly situated the "windfall" benefit of deducting in full the amount of a repayment pursuant to section 16(b), while taxing any capital gain previously realized only in part, serves no logical end. As the Supreme Court pointed out in *Skelly Oil*, the Code should not be interpreted to permit the equivalent of a double deduction absent a clear declaration by Congress of such intent. Similarly, Chief Judge Phillips, under almost identical facts, stated in the *Mitchell* case (428 F. 2d at 263):

> The taxpayer here, as in *Skelly Oil*, received income which was taxed at reduced rates, thereby receiving a tax benefit. In the present case, as in *Skelly Oil*, the taxpayer was required to give up a part of that income. Under *Arrowsmith* and *Skelly Oil*, when income is given up, which in its inception was taxed at reduced rates, the taxpayer is not permitted to enjoy preferred treatment twice by deducting in full the extra amount given up as an ordinary deduction.

Certainly we would not want to make it possible for a person to intentionally avail himself of this benefit.

Finally, unresolved by the majority opinion is whether different treatment should be accorded directors and shareholders affected by section 16(b). Is a shareholder who, either voluntarily or under some form of compulsion, makes a repayment of his "insider" profit to a corporation entitled only to a capital loss deduction while an officer of the same company is entitled to an ordinary-loss deduction? Is a corporate director who receives minimal directors fees from the corporation entitled to an ordinary-loss deduction under similar circumstances? I think not. It is my view that officers, directors and "10 percent" shareholders should all be treated as investors with respect to trading in the capital stock of their companies (excluding dealers in securities). Any gains or losses from the sale of their stock, as well as profits they might be required to restore to their companies under section 16(b), should be consistently treated. No sound reason for bifurcating these transactions has been advanced in the majority opinion.

Under these circumstances I would sustain the respondent's determination in denying the deduction as an ordinary and necessary business expense under section 162(a) of the amount paid by petitioner to Zenith during 1966.

QUEALY, *J.*, agrees with this dissent.